1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF COLORADO

3    Case No. 08-cv-00513-CMA-KMT

4    ================================================

5    TOTAL RENAL CARE, INC.,

6         Plaintiff,

7    vs.

8    WESTERN NEPHROLOGY AND METABOLIC BONE DISEASE, et al.,

9         Defendants.

10   ================================================

11        Proceedings before KATHLEEN M. TAFOYA, United

12   States Magistrate Judge, United States District Court for

13   the District of Colorado, commencing at 9:29 a.m., June 24,

14   2009, in the United States Courthouse, Denver, Colorado.

15   ================================================

16        WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

17   ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

18   ================================================

19                    APPEARANCES

20        CHARLES WEIR, Attorney at Law, appearing for the

21   plaintiff.

22        JEFF CLARK and ELLEN STEWART, Attorneys at Law,

23   appearing for defendant Western Nephrology and the

24   ================================================

25                  MOTIONS HEARING


AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
303-825-6119     FAX 303-893-8305

1                   APPEARANCES (continued)

2        individual defendants.

3                   DAVID PALMER, Attorney at Law, appearing for

4        defendant American Renal Associates and the counterclaim

5        plaintiff American Renal Associates.

6                     P R O C E E D I N G S

7                   (Whereupon, the within electronically recorded

8        proceedings are herein transcribed, pursuant to order of

9        counsel.)

10                  THE CLERK: All rise.  Court is now in session.

11                  THE COURT: Good morning everyone.  Please be

12       seated.  We're here this morning on Case No. 08-cv-513, this

13       is Total Renal Care, Inc. versus Western Nephrology and

14       others.  There are -- I'm not going to read the whole list,

15       but obviously there's counterclaims and cross-claims and all

16       kinds of things, so those are the primary players, as well

17       as ARA.

18                  So may I have appearances for the plaintiff.

19                  MR. WEIR: Good morning, Your Honor.  Charles Weir

20       from McDermott Will & Emery for plaintiff Total Renal Care.

21       Also appearing for counterclaim defendants DaVita and Total

22       Renal Research.  Also with me is Gregory Jones.

23                  THE COURT: Good morning to you.

24                  May I have appearances for the defendants.

25                  MR. CLARK: Good morning, Your Honor.  Jeff Clark

1    and Ellen Stewart on behalf of Western Nephrology, Inc. and

2    the individual defendants.

3         MR. PALMER: And, Your Honor, David Palmer for

4    defendant American Renal Associates and counterclaim

5    plaintiff American Renal Association.

6         THE COURT: All right.  We're here -- I have a

7    motions report, so we are here today to talk about two

8    pending motions.  The Court normally goes by document

9    numbers, which I know that the parties don't particularly

10   keep track of, so I'm sorry if I refer to document numbers

11   instead of the names of the motions, but the first is

12   document 126, it is a motion to compel responses to

13   antitrust discovery filed by DaVita and Total Renal Care.

14   That has been fully briefed.  I've read the motions, the

15   briefs, and the responses.

16        The second is docket number 129, which is motion

17   to compel production of audiotapes from defendant Western

18   Nephrology, that also has been briefed.  I've read the

19   motion, the brief, and the response that was filed, so those

20   are the two motions pending before us.  I have a number of

21   notes and questions and things like that that I have on

22   these -- on the various motions, but I guess I need to know

23   from the plaintiff, primarily, before we start where

24   everything stands, what has been produced and what hasn't

25   been, because some of the responses indicated that there was

4

1     going to be a production before today's date.

2     MR. WEIR: Yes. No, I think that makes -- that

3     makes sense. Let's I guess start with the good news on the

4     audiotape motion. We are withdrawing that motion, Western

5     has produced the tapes and the various gaps that we had

6     identified and the questions we had about missing minutes

7     they have provided us explanations as to those things, and

8     to the extent we have further questions about those matters,

9     we'll meet and confer with them and hopefully resolve it

10    without -- without the need to get the court involved.

11    With respect to the antitrust motions, we received

12    on Monday a partial response to the document demand that had

13    been pending for some seven or eight months. And I say

14    partial response because there's numerous deficiencies with

15    it which, obviously, given the lateness of the response we

16    didn't have an opportunity to brief those, and I haven't had

17    an opportunity to meet with Mr. Palmer about some of those

18    deficiencies, so, Your Honor, I'm not sure that those are

19    matters that we can really bring before the Court, but we do

20    -- that motion from our point of view is still on and there

21    are still issues that we think we need to discuss with

22    respect to the antitrust issues.

23    THE COURT: Now, are we talking then as to -- on

24    Monday, who did you receive your responses from? Is it ARA

25    or Western?

1          MR. WEIR: We received responses from ARA. In

2     Western's opposition brief they had represented to us that

3     it was their belief that they were done with their document

4     production, I believe we received that the first week of

5     June.  We received interrogatories from Western yesterday.

6     Again, we think there are some potential issues with the

7     sufficiency of those, but, you know, I haven't had an

8     opportunity to meet and confer with Mr. Clark, and, you

9     know, hopefully any deficiencies could be -- could be

10    resolved informally without the need for your intervention.

11         THE COURT: All right.  So would it be fair to say

12    then that as far as the motion to compel responses to

13    antitrust discovery that you're not -- you don't have any

14    real issues going forward with Western, other than something

15    that would be brought up later?  I mean, I guess what I'm

16    concerned about, I'm concerned about the timing of

17    everything and your request for attorney's fees for your

18    motion to compel.  If you're satisfied with what Western has

19    done then I think the timing becomes then irrelevant and the

20    request for attorney's fees as to Western becomes irrelevant

21    as well.

22         MR. WEIR: Yeah, I think that's -- I think that's

23    a fair characterization.  You know, Western did provide --

24    they did provide some answers and, like I said, we do

25    believe there are some deficiencies, but my hope is with

1    respect to Western that any of those deficiencies we can --

2    we can work out as we did with the tapes.

3            You know, with respect to -- with respect to ARA,

4    the deficiencies were extreme and we do have concerns also

5    about the timing.  I just don't understand why, you know,

6    eight months late we would be getting our initial set of

7    responses to document demands that were served last October.

8            THE COURT: All right.  I think I never --

9            MR. WEIR: And, I mean, I didn't even -- I didn't

10   even know where they stood, whether or not they would be

11   willing to produce certain things, what their objections

12   were to these until Monday, so, you know, my motion would

13   have looked a lot different if -- and we would have met and

14   conferred over the last, you know, four to five months about

15   perceived deficiencies rather than trying to get them to

16   provide any sort of response.

17           THE COURT: All right.  So let's make sure the

18   record of our minuets is right then.  As far as the motion

19   to compel production of audiotapes, which is document number

20   129, that motion will be shown as withdrawn, is therefore

21   now moot, and so the only thing pending before me is

22   document 126, the motion to compel responses to antitrust

23   discovery, and as to that motion to compel, the only

24   defendant that is -- that you're still wishing to proceed

25   against as far as attorney's fees and costs is ARA.  Is that

1    right?

2              MR. WEIR: Yes, that's correct, Your Honor.

3              THE COURT: All right.  So for Western then, I

4    don't think you have a dog in this hunt at the moment, so if

5    you want to stay or go, I will leave it up to you.

6              MR. CLARK: We will stay if that's all right with

7    Your Honor.

8              THE COURT: All right.  So given that the motion

9    then is still pending for ARA, Mr. Palmer, the ball's in

10   your court.

11             MR. PALMER: Thank you, Your Honor.  I want to

12   perhaps burden you with a little bit of history and some

13   reminders.  You will recall that we were here on January

14   12th for a settlement and scheduling conference, January

15   12th of 2009.  And as a result of that conference an order

16   was entered, which we believed at the time -- and I think

17   all counsel believed -- provided for a pause, the word pause

18   was used in antitrust discovery, and that led to the I guess

19   second or third, but the modified scheduling order that was

20   approved by the Court and entered I believe on January 20th.

21             But I want to make clear to the Court that ARA,

22   unlike DaVita, didn't stop producing documents as a result

23   of that.  In fact, we produced documents on January 9th of

24   2009, we produced documents on February 26th, 2009, we

25   produced documents on March 4th, 2009.  And I'm talking

1    about thousands of pages in each instance.  We produced

2    documents on April 9th, 2009, and we produced documents on

3    May 28th, 2009.  At the time the motion to compel was filed,

4    we had produced over 50,000 pages of documents and had had

5    no conversations that I'm aware of resolving this question

6    of whether antitrust discovery was not stayed as DaVita and

7    Total is now claiming.

8          Nonetheless, we were actively producing many,

9    many, many documents, Your Honor, and those documents are

10   pertinent and relevant to the antitrust issues.  The

11   documents that we have been producing are virtually

12   everything that pertains to these Denver clinics.  Financial

13   records, plans, the startup documents, all of our

14   communications with Western.  And as of the time the motion

15   to compel was filed, I want to remind the Court, as we said

16   in our brief, we have produced 53,000 pages of documents,

17   we had not finished our production, and we had had very

18   little in the way of communications with Mr. Weir until I

19   wrote to him on May 19th.

20         You will recall, Your Honor, that on May 13th,

21   2009, you entered an order in response to another of our

22   joint requests to extend discovery.  You will recall that in

23   this case there is pending motions directed to the scope of

24   the antitrust counterclaim.  We have a Section 2

25   monopolization claim, we have Section 1, conspiracy to

1    interfere with competition claims, and motions have been

2    briefed and pending on those antitrust claims for quite some

3    time, which was why the parties were, if you will, going

4    slower on any sort of focused attention on antitrust

5    discovery, although I want to repeat again, we've already

6    produced virtually everything.

7           On May 13th you entered the revised -- or the new

8    order, minute order, which is document number 135, and you

9    said there in response to the joint motion for extension,

10   you entered new deadlines, tight deadlines, and you said no

11   further extensions of time will be granted, that was entered

12   May 13th, 2009.  So what I did is I wrote a letter to Mr.

13   Weir on May 19th, 2009, which I'd be happy to tender to you

14   if you would like to see it, but what I said to Mr. Weir was

15   we've been asking you for board meetings, board minutes,

16   documentation.  I took issue with their discovery responses,

17   and I said, When are you going to finish producing your

18   documents?  What's your deadline?

19          That letter I wrote to him on May 19th.  And

20   then on June 5th, I wrote to him again, a letter to Mr. Weir

21   and responded to some of his questions.  He seemed to not

22   understand that we were talking about Kaiser Permanente in

23   one of our requests, what we meant about NxStage, which is

24   a home care dialysis product that we believe to be a --

25   exercises exclusive control over.  And again on June 5th, I

1    said, When will you be producing your board or board

2    committee minutes relating to or referencing Western,

3    American Renal, or the Denver area?  Have you completed

4    production of your documents with Denver Nephrology, which

5    is the organization they brought in to replace Western.  I

6    said, Are you going to give us your corporate organization

7    charts?  Why is that difficult?  Do you have a target date

8    for completion of your rolling production of responsive

9    documents?  When?

10          That letter I sent to him on June 5th.  I can hand

11   it to you if you'd like to see it.  He finally responded on

12   June 16th.  June 16th, that's only a week ago.  So 11 days

13   after I sent him an e-mail -- of course, nowadays

14   instantaneously sent it to him -- he responded on June 16th

15   with a long letter, among which he said -- and it really was

16   on various points, but he said in your June 5th letter you

17   inquire about six discovery related items.  As I stated to

18   you in my May 29th letter, we will produce antitrust related

19   materials after the motion to compel ARA is resolved.

20          So at that time we'd produced 53,000 pages of

21   documents, which we believe to be, frankly, far and away the

22   bulk of production.  They had by that time I think produced

23   10 or 12,000 pages of documents as part of their rolling

24   production, and they took the position they we're going to

25   respond to antitrust related discovery until after today.

1     I probably, of course, wrote back two days later on June

2     18th and I said, We don't agree with your position that you

3     can wait until the Court rules on your motion to compel to

4     start producing your own antitrust documents.   We think

5     you've got it backwards.

6           But I also go on and say, Given DaVita's position

7     and the Court's firm discovery cutoff, waiting is no longer

8     an option for your client.  We must proceed, and we intend

9     to proceed.  And I said in that letter, We reviewed again

10    your antitrust discovery requests.  We have already produced

11    nearly all of the documents that DaVita requested.  We have

12    a very limited number of documents that we will be producing

13    soon related to the updated financials for these clinics.

14    And there were a few -- I mean really literally half a dozen

15    pages of other -- other stuff.  We will produce these in the

16    next several days, at which time we will have completed the

17    entire discovery burden while you remain delinquent.   I

18    actually said "woefully delinquent," but I'm not

19    editorializing to you.

20          And on Monday of this week we did produce the

21    financials for the five clinics here in Denver through April

22    30th of '09.  And I have them here if you care to see them,

23    but they are the year-end financials, up through the year

24    ended April 30th of '09 for each of these clinics.  Those

25    are the heart, frankly, of what's been requested.  And we

1    filed some additional responses to our interrogatory
2    responses.  Primarily, Your Honor, our responses to the
3    interrogatories was under Rule 33(d), saying we have
4    produced all of the financial documentation that will show
5    you our profit margins, our gross margins, how we compensate
6    people and all of these things you want.

7           I then -- I went back to the paralegal and younger
8    lawyer and discussed with them some of the specific requests
9    that Mr. Weir has been mentioning.  33(d) is -- was part of
10   our response and then in certain instances we said, In
11   addition, you should look at the frivolous litigation you
12   filed against all of these former DaVita employees.  We
13   listed the case numbers and we said those are public record.
14   We identified Kaiser Permanente and NxStage again, although
15   I had done that in letters.  And I went back, as I said to
16   our paralegal, and I said, Have we produced business plans?
17   They say we have produced everything we have related to the
18   Denver clinics.  I said, What about financial statements?
19   We've produced everything up until July 31 of '08. And, in
20   fact, we've produced financial statements through '09 at
21   this point.  Board meetings, we've produced everything we
22   have that relates to any of the Denver clinics, any
23   references to these Denver clinics or to Western, and we've
24   produced all of ARA's sales volumes for the Denver area,
25   including updated financials.

1       I tried to get ahold of Mr. Weir and Mr. Ryan on

2    Friday, I said, We need to talk, we have this hearing coming

3    up.  We finally spoke to them yesterday, yesterday being

4    Tuesday.  We had a conference call and what we were partly

5    talking about is the fact that we've got until July 29th to

6    take depositions.  And I said to Mr. Weir on that call,

7    Well, when are you going to finish your production? Because

8    we think we've finished ours.  You know, I understand you

9    may -- because he said we're -- maybe we're woefully

10   delinquent, he can use my words.  I don't think we are.  I

11   don't think we have anything left to produce, but we're

12   certainly willing to look.  But I said, When are you going

13   to produce documents? And he said, Well, maybe we can do so

14   by July 1st.  And we might be done by July 1st.  There's a

15   lot more coming, he said, it's a sizeable production.  He

16   said everything that I've asked, I, David Palmer, have asked

17   for in my numerous letters, I haven't by any means quoted

18   all of my letters to Mr. Weir, he said you're going to get

19   all that around July 1st.

20       And I have the impression, although he didn't use

21   a number, that it's going to be at least 50,000 pages and

22   maybe more, and I said, Will you withdraw your requests for

23   these monetary sanctions?  I said, You've got this

24   backwards.  If anybody should be sanctioned here, it's

25   DaVita.  And he said, No, we're going to go forward with

1    this hearing and finish our production later.

2          Well, Your Honor, among the deponents we're trying

3    to depose is Mr. Kent Thiry, the president of the company.

4    They've told me they're going to fight that.  They say he

5    doesn't have what they call particularized knowledge.  I

6    said, Well, read our complaint, he's made threats, he's

7    pounded the table, we want his deposition, but we want

8    documents.  When are we going to get this deposition taken,

9    or any others?

10          The truth of the matter is, with the exception of

11    half a dozen depositions of the doctors, no depositions have

12    been taken.  And we all were waiting I thought to get these

13    documents in order and at least get them exchanged.  I

14    realize that's off the point, Your Honor, and maybe I'm --

15    maybe I'm wandering, but I fervently believe that they have

16    it backwards and that if anybody is delinquent, it's DaVita.

17    And this explanation that they're not going to produce any

18    antitrust documents, which by that it really means

19    financials and plans and maybe some board minutes and things

20    like that where they might have discussed this change, we

21    need those documents, and how come they take the position

22    that they'd don't have to produce those documents when we in

23    fact have already produced them, most of them, except the

24    most current, which we've now produced, until their motion

25    to compel is granted?

1        I just -- I've never seen anything like this.

2    I've never -- I don't understand their position, truthfully.

3        THE COURT: Well, in the scheme of looking at

4    timing, and I'm going off the paperwork now that I received,

5    when I did the order -- the first order that granted some

6    extra time back in January, my understanding was that you

7    hadn't focused on the antitrust issues, as you said, because

8    of the pending motion, and so, therefore, you needed time to

9    do that.

10       MR. PALMER: Yes.

11       THE COURT: So my intent was that I give you more

12   time so that you could do that.  I had read it that you had

13   done most of everything else and you had waited on that just

14   to see because the motion -- I think it was filed, what,

15   September 5th, so really it is quite old at this point.  So

16   that's what I was intending that you do is start the

17   antitrust --

18       MR. PALMER: Well, and I think that's what we did.

19   We made five different productions, January, February,

20   March, April, and May, which were financial information, et

21   cetera, et cetera.  Those are the 53,000 pages that we'd

22   produced in what I thought was an agreed rolling production.

23   My client is saying, Well, how come we're producing and

24   they're not?

25       THE COURT: Well, the way I read the pleadings in

1   this is that Total Renal Care says that they did produce,

2   that they produced earlier.  In other words, before the

3   Court's motion they had produced a bunch of antitrust

4   documents to you.  Is that not your read on it?

5           MR. PALMER: Well, they have produced -- they had

6   produced 24,000 pages of documents as of the filing of their

7   motion to compel, and we had produced 53,000 pages of

8   documents.  Their 24,000 pages of documents do not include

9   a lot of this so-called sizeable production that is yet to

10  be produced.  And that, as I understand it from what Mr.

11  Weir has said, that's based on computer searches of the

12  files of certain individuals who had important roles in this

13  Denver changeover.

14          I think they had made some partial production.

15  I'm not saying they produced nothing.  What I am saying is

16  that we are way ahead of them and we have now finished and

17  we're getting told that they're not going to produce this

18  additional set of documents until July 1st.

19          THE COURT: Well, I've not -- I guess I don't

20  follow too much the -- your numbers.

21          MR. PALMER: Oh.

22          THE COURT: I mean, I don't really care how many

23  documents there are, I care about the content.  I mean,

24  somebody might have 50,000 and the other person might have

25  a hundred and the hundred say more than the 50,000, so --

1          MR. PALMER: I don't disagree with that, Your
2     Honor, and I know it's not just a numbers game.  What we
3     have produced and what I've reconfirmed is that in that
4     53,000 pages is everything that we thought and believe is
5     responsive, except for these most current financials that we
6     filed a couple of days ago.  And truthfully, we -- those are
7     through April 30th of 2009.  They were -- I suppose we could
8     have produced them in May if they were ready, I don't know
9     when they were actually finalized, but that 53,000 pages
10    that we'd produced before was everything we have.

11         And what DaVita continues to tell me, DaVita,
12    Total, is that they have a whole lot more yet to come.  And
13    bear in mind, Your Honor, we've already done our opening
14    antitrust expert report in the face of what we had, but
15    apparently, and perhaps Mr. Weir might answer the question
16    of when and how many more documents are coming, in terms of
17    the motion to compel, we made five productions, January,
18    February, March, April, May.  We exchanged lots of
19    correspondence.  I told Mr. Weir, we are producing, we got
20    this May order, which I think leaves very little doubt that
21    the game is up and there is no more delay going to be
22    (inaudible).

23         And I wrote to him and said, When are you going to
24    pick up the pace?  And as recently as yesterday I'm told
25    July 1st we're going to produce.  I'm not angry at them.

1    You know, I frankly think we would all be much better off if

2    Judge Arguello were to rule on the motion to dismiss and

3    perhaps we'd have a little better sense of the contour of

4    the antitrust claims.  I think on the other hand, though,

5    most of them, if not all, are in good shape and are going to

6    survive.  And now what we're doing is trying to schedule

7    depositions, but in the face of not knowing when we're going

8    to get this sizeable additional production.

9         I have no problem trading letters with Mr. Weir

10   about what he thinks we haven't yet produced.  The people

11   that I have that have been in charge of this tell me there

12   isn't anything left to look for.  And I've seen the

13   communications with our client and Mr. Mike Davis, my

14   associate, has gone to Boston, spent several days there

15   gathering records, you know, a long time ago, and has had

16   frequent conversations with Mr. Weir.  While I say I'm not

17   head up about this, I am frustrated.  I think it's backwards

18   for them to say they're going to produce later depending on

19   how you rule today.  I don't know how your ruling today

20   impacts on their work.

21        THE COURT: Well, I don't -- I don't either.  Mr.

22   Weir, do you want to respond to this?  I am concerned about

23   -- I think I understand from your motion and the

24   attachments, reading the letters, that originally you

25   believed you had produced antitrust material and you weren't

1   willing to produce anymore until they did, but I would like

2   you to address basically what Mr. Palmer's been talking

3   about and what your position is on the documents you now

4   have to produce.

5        MR. WEIR: Yes, I --

6        THE COURT: I don't really understand how this -- how

7   our hearing today had very much bearing, I can see some, but

8   not very much bearing on your not producing the antitrust

9   documents.

10       MR. WEIR: Well, I actually think you've identified

11  the issue and identified what my concern has been all along.

12  We engaged in the search for antitrust materials and began

13  producing antitrust materials.  We were told by Mr. Palmer

14  that ARA would not engage in that process, that they

15  believed there was a stay in place and they didn't have to

16  produce antitrust materials and, in fact, that they would

17  seek a stay of discovery, they would bring a motion to seek

18  a stay of discovery to stop the antitrust case.

19       I informed him, and you can see from the

20  correspondence that we did not believe that there was a stay

21  in place and that they should begin producing their

22  materials.  It wasn't -- as Mr. Palmer was going through his

23  list of, you know, back and forth on this, it wasn't until

24  June 19th, which is what, four days ago, where Mr. Palmer

25  said, yes, we are engaging in antitrust discovery and you

1   have everything, and this is after four months of them

2   saying we're not even going to start.

3          I didn't think it was fair that we should have to

4   produce in a vacuum.  If they would have told of this, that,

5   look, we've -- we are engaging in antitrust discovery, here

6   are your responses to your document demands, this is where

7   we stand, we are going to move forward with this case.  If

8   they would have told me that in March, we would have set

9   deadlines significantly earlier and would have had more

10  documents out the door.

11         But what he's asking -- what he's saying should

12  have happened is when they're saying we're not going to

13  engage in any antitrust discovery, we are nevertheless

14  obligated to move on and produce documents in a vacuum.  And

15  I don't think that's fair and I don't think that's how the

16  -- that's how the discovery process should work.  So as soon

17  as I got Mr. Palmer's letter on the 19th saying, look, this

18  is -- this is what our schedule is, this is where we believe

19  we are, I immediately sent him another letter that day

20  saying, okay, fine, thanks, our date is July 1st .  The only

21  reason it's July 1st is we just need processing time with

22  vendors and whatnot to get stuff out the door.

23         THE COURT: Well, how about the -- Mr. Palmer's

24  representation to the Court that he was producing documents,

25  he named several dates, February 26, March 4, April 9, and

1    May 28.  Were those documents antitrust documents?  Because

2    it seems to me if they were part -- at least part of what

3    you were looking for in the antitrust documents, it would be

4    incumbent upon you to see that no matter what he said he

5    actually was producing antitrust documents.

6         MR.  WEIR:  I don't  --  I don't think  --  the

7    documents that we received from them are documents that

8    relate to their construction of the Western clinics and

9    their relationship with Western.  We have received very

10   little materials with respect to ARA board meetings.  In

11   fact, I haven't -- I don't believe there are any ARA board

12   meetings in the -- in the production.  And, again, I haven't

13   had an opportunity to discuss this with Mr. Palmer, because

14   I didn't expect on Monday to get a statement saying, oh, by

15   the way, we're done, after four months of saying we're not

16   even going to start.

17        So, you know, I'm not seeing the strategic plans

18   he's referring to.  We did receive financials on Monday.  I

19   don't have any of the backup for the financials.  I still

20   don't know who their -- exactly who their employees are.  I

21   don't know what they're paying them, other than a top-line

22   number.  So there is a series of documents that we believe

23   are missing, and I was under the impression that there was

24   going to be an additional production, especially given that

25   they took the position for four or five months that we're

1    not even going to start this process because we believe

2    there's a stay in place.

3         All I got between the -- the productions that I've

4    got that are antitrust related that supposedly were going to

5    wrap this up, I got, you know, 30 pages of materials on

6    Monday.  You know, so the rest of the stuff, could there be

7    some overlap and some, you know, if -- you know, do they

8    potentially relate to antitrust issues because they

9    generally relate to the area?  Sure, there's always going to

10   be some overlap between those things, but the core antitrust

11   issues at stake, I'm not seeing anything.  I don't know what

12   -- I don't know what they've done with respect to their

13   payer contracts in Denver.  I don't know what they've done

14   with respect to trying to secure, you know, alternative --

15   alternative home dialysis products.

16        I mean, they've taken the position that there are

17   no documents on home dialysis products.  I know that's not

18   true because they sent me financials to say they have home

19   dialysis patients, so there are significant holes in their

20   production and I expected to see those gaps filled in and I

21   expected them much earlier to commit, yes, we will in fact

22   start antitrust discovery and engage in the meet and confer

23   process.  That didn't happen until June 19th, and that's --

24   that's my frustration, and that's why I think -- now we have

25   a time crunch created, which could have been avoided if they

1        just said four months ago, okay, fine, here's our -- here's

2        our responses, this is where we believe we stand, where do

3        you stand?

4               THE COURT: Well, I hear what you're saying, but it

5        -- you still haven't answered my question about what was in

6        all of that production that apparently was occurring about

7        once a month in February, March, April, and May.  I mean, if

8        that was -- if the production that you were getting was

9        information that related to the antitrust, I think that that

10       says something.  I mean, it may say we still object to it,

11       we don't want to do it but here it is.

12              MR. WEIR: No, I mean --

13              THE COURT: And that's what I hear Mr. Palmer

14       saying is that regardless of whether they believe there was

15       a stay or not at that time they were still producing.

16              MR. WEIR: What we received in those productions

17       were materials about the buildout, whether there's going to

18       be certain paintings in certain offices, what the color

19       schemes are going to be, licensing material to get the

20       centers up and running.  It was material that related to the

21       centers themselves.  And, you know, those would have been

22       responsive to the non-antitrust discovery requests.

23              Now, I'm not going to say those things couldn't

24       also bleed over into some of the antitrust issues, but they

25       were -- to us they appeared that they were responsive to the

1    non-antitrust discovery requests, and there was nothing in

2    there that said, oh, geez, you know, now they've started

3    their antitrust production.  And if that was their belief,

4    I don't know why they waited until June 19th to say, look,

5    we are beginning, this is it, because my letters do not say

6    categorically, look, we're not going to wait until the

7    motion, my letter said, look, either the Court's going to

8    order you to start or you just tell me that we're going to

9    start and we'll engage in what our schedule is going to be,

10   but I didn't see why we should be obligated to engage in a

11   one-sided discussion on that matter, and up until June 19th

12   it was still their position that, look, you know, there was

13   a stay in place and we're not going to do it.

14           THE COURT:  All right.  And so that -- and that

15   would have occurred in your mind about eight days after you

16   filed -- well, that's the 1-29.  Let's see, what's the date

17   you filed this motion was -- yeah, also on the 11th --

18           MR. WEIR:  May 11th.

19           THE COURT:  -- so  about --

20           MR. WEIR:  I mean, it was even -- it was even six

21   weeks after we had filed the motion.

22           THE COURT:  All right.  And what do you -- how do

23   you make the argument that it wasn't really until May 13th

24   when my order said you're not getting any more extensions

25   that it became perfectly clear that I was not going along

1       with any kind of pause or stay?  And you don't need to argue

2       to me that you had sent them a letter saying you didn't

3       agree with the stay because I know that, I read that

4       February 10th letter of 2009, and I agree that your letter

5       was absolutely clear that you didn't think there was a stay.

6               But do you think that the May -- May 13th order

7       provided the ultimate in clarity and that may have been what

8       started the letter writing between you and Mr. Palmer?

9               MR. WEIR:  Well, I mean, it's kind of -- without

10      going back to the letters and the correspondence, I mean,

11      from my point of view our position has been fairly

12      consistent all along.  We offered up a stay, it was denied.

13      We were served with antitrust discovery requests and, you

14      know, we moved forward.  When we served discovery requests

15      on them, they asserted a stay.

16              I don't think your May -- I think they would have

17      known well before that that things had to move forward.  I

18      mean, your January 28th order set discovery deadlines, you

19      know, so to say that nobody knew that there wasn't in fact

20      a stay until May, I just -- I think that's hard to see based

21      on the -- based on the record.  You know, and also keep in

22      mind, I think Mr. Palmer mentioned it was a joint -- a joint

23      submission on -- for an extension of time in the May time

24      period.

25              It was joint with respect to ARA and Western.  We

1    were frustrated that there was no movement and they were

2    still taking the position that antitrust discovery was

3    stayed.  We opposed that motion and said, look, this is --

4    if you want to pursue your claims, pursue your claims, but,

5    you know, we shouldn't be stuck here waiting for, you know,

6    a motion that you think has no merit.  It didn't make any

7    sense to us and we wanted to push forward.

8         So, you know, hopefully that answers your

9    question, but I think it's certainly difficult to look at

10   the correspondence back and forth and believe that there was

11   an agreement in place that the parties were going to stay

12   antitrust discovery.

13        THE COURT: Mr. Palmer, do you want to respond to

14   any of that?

15        MR. PALMER: Well, I'm not sure that I do.  Your

16   Honor, certainly we believed that we had an agreement with

17   Mr. Tom Ryan, who is the person I talked to that the pause

18   in antitrust discovery was in place but that both sides were

19   in the process of making this rolling production.  And

20   you've said that in the February letter from Mr. Weir he

21   says there's no stay in place, that's true, and I disagree

22   with that statement.  I think in fact the parties had agreed

23   to a stay or pause but that we were doing rolling

24   productions anyway.  And then when we filed the last request

25   to extend so that we could await Judge Arguello's ruling,

1     that's when they first said, no, we're not going to do that

2     anymore.

3          And then you fairly quickly, as I recall, entered

4     the May 13th order, which to me was crystal clear that we

5     were off and running and we were off to the races, and

6     that's why I wrote my letter of June the 5th, June 5th to

7     Mr. Weir, which I'd be happy to hand to you, and then he

8     responds on June 16th and he says we will produce antitrust

9     related documents after the motion to compel ARA to initiate

10    antitrust discovery is resolved.

11         Well, it made no sense to me to say that, but,

12    frankly, communicating with Mr. Weir has been difficult and

13    that's why we write so many letters.  I don't usually write

14    this many letters about rolling productions and who's

15    produced what, but we have found that it's a moving target

16    sometimes.

17         He still has not answered how many documents he's

18    going to be producing on July 1st.  This label of antitrust

19    documents is misleading.  There's no such thing as -- I

20    mean, there aren't documents that I'm aware of where

21    somebody says, oh, we're now a monopolist, you know, we're

22    going to squeeze out our competition, we're going to take

23    unfair actions, we're going to file frivolous lawsuits

24    against ex-employees, we're going to impose retention

25    bonuses which we've never done before, we're going to put

1    non-competes on the people that work at the DaVita, Total

2    clinic and the minute they hiccup we're going to sue them.

3            Those are the -- you know, they have a deal with

4    Kaiser Permanente, that Kaiser Permanente patients -- that

5    moves them only to DaVita clinics, it's a differential in

6    reimbursement.  We are -- we are very strenuously trying to

7    have our own contract with Kaiser and we have been told by

8    Kaiser that they can't do it because DaVita's pressuring

9    them and DaVita has told them that if you enter into a

10   contract with ARA, we're going to make you pay higher rates

11   throughout Colorado.

12           Now, we haven't seen any documents, other than

13   what we've seen from our own efforts with Kaiser, but that's

14   a clear antitrust violation, that's called full line forcing

15   when you have control, as they do, of Colorado dialysis

16   patients, and there's a huge number of those patients who

17   are at Kaiser and they've helped Kaiser in order to deal

18   with us at the rate you currently have, you have not deal

19   with no one else.  Well, that's an antitrust violation,

20   that's not an antitrust document.

21           My point being that the documents, they don't say

22   antitrust on top, they are the financial -- they have

23   everything concerning these Colorado claims.  I don't think

24   there's anything they don't have.  And it has been a rolling

25   production and I understand that search terms have been

1    discussed and Mr. Weir has been doing searches and things,

2    but how many are we going to get on July 1st?

3           The critical point is should ARA be sanctioned,

4    and I would say, respectfully, of course, that's your

5    decision, but absolutely not.  I mean, we've made every

6    effort to consult.  I think until the May 13th order came

7    out, I think there were good grounds to believe that there

8    was a rolling production, that it was okay and that both

9    sides were doing it.  When the May 13th order came out, it

10   was certainly clear to me that we had to pick up the pace

11   and get this wrapped up, and we did.  Did we take two weeks

12   too long?  Maybe so, but I was getting letters which I've

13   quoted to you saying we, DaVita, we're not going to produce

14   any antitrust related documents until after the hearing.

15          I didn't know what to say to them, frankly.  I

16   know what I said yesterday, I said it's backwards, how can

17   you take depositions?  But, anyway, I'm sorry, I'm sort of

18   wandering, but --

19          THE COURT: Well, let's take things one at a time.

20   I'm interested for different reasons in what DaVita is going

21   to produce on the 1st of July, but let's talk about the

22   motion first because the motion is not before me to sanction

23   DaVita or compel DaVita to do anything.  The motion is

24   DaVita's motion to compel responses and, more importantly,

25   of course, for everyone is now the issue of sanctions

1    because apparently the documents have been compelled.

2           So looking at this before this hearing, I did note

3    a few things that we have talked about.  The first was that

4    in my estimation the Court's order, as I've already told

5    you, of the 28th of January was I thought rather clear that

6    I understood why discovery was late and why discovery had

7    not been done on the antitrust issues at that point.  It was

8    almost six months that the motion had been pending and I

9    think it was reasonable to expect a ruling on that at any

10   point at that time.

11          The problem was, as is reality, Judge Arguello was

12   new to the bench and this was not her case previously and it

13   was transferred to her, and having been in that position

14   myself on this lower level I know what that means and so she

15   probably just didn't see it.  There's who knows how many

16   older motions were sitting out before this one that she may

17   have gotten from other judges, so -- so it didn't happen, as

18   was to be expected, but when I issued that order my

19   expectation was that, well, it's been six months, you're

20   going to get the ruling anytime now, let's get going.  You

21   can't put it off any longer, you'll find out within the next

22   few months so get going on the discovery.

23          I think it was made very clear by the February

24   10th letter from DaVita that they did not believe there was

25   any kind of stay.  Now, I think it's fine to disagree with

1    that, but if one side doesn't agree, you don't have an

2    agreement, and there was certainly no stay issued by the

3    Court, none of you came to me and asked for a stay.  So I

4    think at the very latest, by February 10th, everyone should

5    have been on notice that the parties were not in agreement

6    on this, the Court had not ordered a stay, and so,

7    therefore, you should have proceeded as though there wasn't

8    a stay.

9         So really what we're talking about is the time

10   difference between that February 10th letter and, well, I

11   guess, May 11th, when the motion to compel was filed, and,

12   almost as importantly, on May 13 when the Court's order came

13   out and all of you I think were perfectly then well aware

14   that no matter what you had been thinking before, that

15   wasn't true, that you needed to get going.

16        So there's approximately a 90-day period in there

17   where in my estimation more could have been done.  However,

18   based on what I've heard today, Mr. Palmer had told me, and

19   I haven't heard anything to refute this, starting -- well,

20   probably starting earlier than this, but at least on

21   February 26th, which was after the 2-10 letter, production

22   did start from ARA and it was rolled out pursuant to the

23   parties' agreement in a series of productions from February,

24   March, April, then the end of May, this is, of course, after

25   the Court's May 13th order, with quite a bit of hustle and

1    bustle, if you will, going along in early June to try to get

2    things resolved.  That happened actually with both parties,

3    because, obviously, Western was bustling along too.

4         I don't really understand why DaVita would have

5    waited.  However, I can't say that waiting was necessarily

6    any kind of sanctionable activity because they did have that

7    position that they had already produced some of the

8    financial reports and that they didn't want to produce more

9    than you did, so it was kind of a standoff if you want to

10   characterize it that way.  However, I do think that it was

11   reasonable that the actions taken by ARA under all the

12   circumstances, while I somewhat disagree with waiting until

13   May to really get at the heart of any of these issues, I

14   think it was reasonable and justified that you did that.  I

15   don't think it was so outrageous and so much withholding

16   that it would really justify sanctions in this case under

17   Rule 37.

18        And I will tell you that I was seriously

19   considering them in this case because I really thought it

20   was pretty clear back in February what everybody should be

21   doing.  But I'm going to give you credit for doing a lot of

22   it, because, as we end up here today, what ends up happening

23   is really you tell -- in early June you're telling DaVita

24   that you think you've produced everything.  If that -- if

25   you have produced everything, and I know there may be an

1    issue about that, but to the extent that you think you have,

2    that means it had to have come in those months intervening,

3    so I'm not going -- I am going to grant the motion to the

4    extent that there's anything left to compel, however, I am

5    not going to grant any sanctions in this case because I

6    don't think that they are merited under all the

7    circumstances of the production.

8          So that leaves us now today with a discovery

9    cutoff date of the 29th of July. So, Mr. Weir, tell me,

10   what it is that you're getting ready to produce and do you

11   think that's in your estimation going to have an impact on

12   these discovery deadlines.

13         MR. WEIR: We -- Mr. Palmer's supposition about

14   volume is probably about right as far as just -- as far as

15   raw pages it probably will be somewhere in the 50,000 page

16   range.   And it will in our estimation be effectively

17   complete, and the only reason I say effectively is because

18   we will do some -- you know, after that production we'll

19   benevolently do some, you know, cleanup to make sure we've

20   looked in all the nooks and crannies and picked up any

21   remaining, you know, random documents. I expect there to be

22   little if anything produced after July 1, but, you know,

23   until I do kind of the final sweep I would -- you know, I

24   wouldn't want to represent that there is absolutely no

25   possibility that there couldn't be another straggler coming

1    in after July 1.

2         But we had been, during this entire time have been

3    collecting the documents, going through an extensive review

4    process to produce these materials as soon as, you know,

5    antitrust discovery was off and running or until we got a

6    representation from ARA that it was in fact moving forward.

7    So it is not as if we have not been engaged in the discovery

8    process during this time, so I expect -- like I said, I

9    expect our production to be effectively complete on July 1.

10        You know, that we -- the parties have discussed --

11   or we did discuss yesterday kind of timing and what we

12   thought, you know, would be reasonable.  And the parties

13   looked at their calendars and the various calendars of the

14   potential deponents and it became kind of clear that it will

15   be very difficult for the parties to continue -- as far as

16   to complete the depositions -- without bleeding into August

17   to some degree.

18        I kind of gave you a lot there, answered your

19   question and then kind of set the stage where I think -- and

20   Mr. Palmer and Mr. Clark can disagree with me, but I think

21   what is a joint request to kind of kick the deadline out 30

22   days so that we can -- we can get the various depositions

23   scheduled without causing a tremendous amount of heartache

24   for the various deponents.

25        MR. PALMER: We did talk about whether or not the

1    Court might consider a 30-day extension to complete
2    depositions, and having looked at their list, which I think
3    frankly is -- violates Rule 30(a), but we're not going to
4    fight that one just yet, but I do think that given the July
5    4th holiday and them not producing such a large volume of
6    documents till July 1, that a 30-day extension for
7    depositions only perhaps would be the right -- well, I don't
8    know whether that's right or not or whether just a 30-day
9    extension is right, because I am learning that getting Mr.
10   Thiry under oath is going to take a court order and that's
11   probably going to require a hearing, so there's probably
12   going to be some other disputes coming up.
13        THE COURT: Do you want to weigh in on this from
14   Western and the individual defendants?
15        MR. CLARK: Yes, Your Honor.  We did have that
16   call.  We are -- on behalf of Western we're in agreement
17   that the scheduling -- we're getting 50,000 plus documents
18   on July 1 and then trying to get our hands around those
19   documents and conduct all the depositions that need to be
20   conducted given the 4th, given everyone's witnesses'
21   vacation schedules and things like that it's going to be
22   nearly impossible.  We do think an additional 30 days will
23   allow us to get it done.
24        THE COURT: All right.  That's going to require
25   that we -- I think it should require that we extend the

1     final  pretrial  conference.   Technically,  I  guess,  we

2     wouldn't  have  to,  but  you  would  have  a  final  pretrial

3     conference,  you  know,  a  day  or  two  after  the  close  of

4     discovery.   What  do  you  think  about  that?   I  mean,  I  don't

5     care  too  much,  but  it's  really  the  work  for  you,  because  you

6     have  to  put  in  your  witness  list,  exhibit  list,  you  know,

7     theories  of  the  case  and  you're  bound  by  that,  so --

8               MR. PALMER: We  would  agree,  Your  Honor.

9               MR. WEIR: Yeah,  I  think  it  needs  to  be -- to  be

10    moved.

11              THE  COURT: All  right.   Let's -- I'm  really

12    hesitant  to  say  that  if  I'm  going  to  give  you  another  30

13    days  that  I'm  going  to  limit  it  somehow.   I  really  would

14    like  you  to  do  everything  that  you  think  you  need  to  do,

15    whatever  it  is,  by  the  close  of  discovery,  and  I  don't  want

16    to  hamstring  you  in  case  it's  something  that's  a  little  bit

17    different  from  a  deposition.   Obviously,  these  motions  need

18    to  be  resolved.   I  have  every  belief  that  this  outstanding

19    motion  will  be  ruled  on  at  least  by  the  end  of  September,

20    but  I  think -- before  then,  I'm  pretty  confident -- because

21    it  takes -- it  takes  a  while  to  kind  of  get  your  hands

22    around  what  you've  got,  but,  once  you  do,  usually  it's  kind

23    of  a  (inaudible)  thing,  you  know,  it's  first  in,  first  out.

24              And  you're  getting  ready  to  need  a  trial  date.

25    Judge  Arguello  is  scheduling  trial  dates  after  the  final

1    pretrial conference within 60 days in some circumstances.

2    At the most she has told me it's going to be four months.

3    Not in your particular case, but I told someone six months

4    a few weeks ago and she called me up personally and said

5    it's not six months, it's between 60 days and four months.

6    So I'd like you to really get it done so that you'll be

7    ready to go.

8              So let's make your discovery deadline -- instead

9    of July 29th, we'll extend it to August 28, and then that

10   would make dispositive motions deadline due, let's say,

11   9-30, and then we need to pick a time for a final pretrial

12   conference at the end of October.  So if you could give us

13   some dates, Ms. Brown.  I know that I'm out that last week,

14   so let's get it before then rather than later.  Well, no,

15   wait, maybe make it later.

16             THE CLERK: Later.

17             THE COURT: That gives you a little more time.

18             THE CLERK: So --

19             THE COURT: So maybe the first --

20             THE CLERK: -- so maybe the first week of November?

21             THE COURT: Right, somewhere in there.

22             THE CLERK: All right. Let's see. What about

23   Tuesday, November 3rd at 9 a.m.?

24             THE COURT: How does that work for everyone's

25   schedule?

38

1          MR. PALMER: That works for me, Your Honor.

2          MR. CLARK: Yes.

3          MR. WEIR: We'll make it work, Your Honor.

4          THE COURT: All right.  It's my intent to send a
5     short e-mail to Judge Arguello letting her know what we're
6     doing in this case, just so she doesn't read the order,
7     because there -- unless you want a transcript of this
8     hearing, it probably won't be transcribed, the minutes are
9     pretty abbreviated, so I'm going to send her a little note
10    telling her why we delayed this, and, you know, I suppose if
11    she has anything to say about that, that she doesn't like
12    it, she'll probably communicate with me rather than you.

13         But if you get something from me saying we need a
14    status conference, you'll know why.  But if we -- one thing
15    I am anticipating is maybe some more hearings.  You might
16    put on your -- any motions that you feel you need to file,
17    if it's for a deposition or if there is -- Mr. Weir, I've
18    heard you talk about deficiencies you think there are in
19    discovery, you might ask for expedited review on that.  That
20    at least gets the attention of all of our law clerks in this
21    court and they know to put those up towards the top.  If you
22    do it all the time, of course, then you get ignored, but in
23    your case they'll tell me if it comes in expedited, and
24    we'll probably set a pretty quick briefing schedule and a
25    hearing if we have to have one.

1           MR. WEIR: Okay.  Thank you, Your Honor, that is

2    good to know, because I -- hopefully we can work it out,

3    but, yeah, there's -- we may have more motion practice.

4           THE COURT: Right.  All right, anything further

5    then that we can do today?  For the plaintiff?

6           MR. WEIR: Not for us, Your Honor.  Thank you very

7    much.

8           MR. PALMER: Nothing for ARA.  Thank you, Your

9    Honor.

10           MR. CLARK: Nothing for Western.  Thank you, Your

11    Honor.

12           THE COURT: All right.  We'll be in recess.  Thank

13    you.

14           THE CLERK: All rise.  Court is in recess.

15

16           (Whereupon, the within hearing was then in

17    conclusion at 10:28 a.m. on June 24, 2009.)

18

19           I certify that the foregoing is a correct

20    transcript, to the best of my knowledge and belief, from

21    the record of proceedings in the above-entitled matter.

22

23

24    /s/ Bonnie Nikolas                  June 30, 2009

25    Signature of Transcriber                  Date

AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
303-825-6119       FAX 303-893-8305