**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Civil Action No. 08-cv-00513-CMA-KMT

TOTAL RENAL CARE, INC.,

      Plaintiff,

v.

WESTERN NEPHROLOGY AND METABOLIC BONE DISEASE, P.C.,
MICHAEL ANGER, M.D.,
MATTHEW ESSON, M.D.,
EILEEN FISH, M.D.,
DAVID GILLUM, M.D.,
RICHARD HALTERMAN, M.D.,
MARK HARRISON, M.D.,
KAREN LOCHHEAD, M.D.,
THOMAS MOONEY, M.D.,
HARMEET SINGH, M.D.,
AMERICAN RENAL ASSOCIATES INC., and
DOES 1 THROUGH 50,

      Defendants.


AMERICAN RENAL ASSOCIATES, LLC,

      Counterclaim Plaintiff,

v.

TOTAL RENAL CARE, INC., and
DAVITA, INC.,

      Counterclaim Defendants.

---

**ORDER ON MOTION TO DISMISS COUNTERCLAIMS**

---

This matter is before the Court on Counterclaim Defendants' Motion to Dismiss the Counterclaims of American Renal Associates, LLC (Doc. # 88).  For the following reasons, the motion is GRANTED, and the counterclaims are dismissed, albeit without prejudice to refiling.

## INTRODUCTION

DaVita, Inc. ("DaVita") is the parent company of Total Renal Care, Inc. ("Total Renal Care") (collectively, "TRC").  TRC specializes in kidney dialysis services, including dialysis clinics.  TRC has a substantial market share – 80% – of the kidney dialysis clinics in the Denver metropolitan area.  American Renal Associates, LLC ("ARA") is also in the dialysis clinic business.  ARA claims that, after learning that ARA planned to enter the Denver market, TRC behaved illegally and inappropriately in order to stifle ARA's entry and thereby nip a competitive threat in the bud.  In response to a lawsuit brought by TRC, ARA asserted numerous counterclaims for violation of the federal antitrust laws.  TRC has moved to dismiss these counterclaims on a number of grounds.  That motion is briefed and ripe for decision.

## BACKGROUND[1]

TRC initiated this litigation against ARA, Western Nephrology and Metabolic Bone Disease, P.C., and a number of Western Nephrology's physicians.  (Doc. # 1.)  Western Nephrology operated TRC's kidney dialysis centers under a "medical director"

---

[1]   The Court accepts the well-pleaded facts of the counterclaims as true, as it must at the motion to dismiss stage.  *See, e.g.*, *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009).

agreement.  (*Id.,* ¶¶ 18-23.)  That agreement contained various provisions intended to protect TRC, such as non-competition, non-solicitation, and confidentiality covenants. (*Id.,* ¶¶ 24-38.)  TRC alleged that Western Nephrology breached these obligations – assisted and induced by ARA – when it began working with ARA to establish dialysis centers that would compete with TRC's.  (*Id.,* ¶ 1.)  TRC quickly moved for a preliminary injunction.  In May 2008, the Court held a hearing on TRC's motion, at which there was substantial testimony from TRC officials about the competitive pressures TRC faced from ARA's entrance into the market.  (*See* Doc. # 88, Ex. A (Preliminary Injunction Hearing Transcript).)

Following this hearing, ARA filed an amended answer to TRC's complaint, in which it asserted several counterclaims.  (Doc. # 79.)  The counterclaim allegations drew significantly upon the testimony at the preliminary injunction hearing, and specifically the statements concerning the threat ARA posed to TRC.  (*E.g., id.,* ¶¶ 123, 128, 129.)  ARA contended that TRC had a monopoly in the market for dialysis clinics in Denver and that it abused its power in order to hold on to this dominance.  (*Id.,* ¶¶ 117-144.)  Specifically, ARA alleged that, upon learning of ARA's plans to open competing dialysis clinics, TRC: terminated its contract with Western Nephrology (*id.,* ¶ 134); brought suit against ARA and requested a preliminary injunction in an attempt to slow ARA's entry into the market (*id.,* ¶¶ 135, 138); attempted to "lock up" its staff (to prevent them from leaving and joining ARA) by way of illegal non-compete contracts and significant bonuses (*id.,* ¶¶ 136-137, 139); pursued "sham and meritless" litigation

3

against its former employees for breach of these non-compete agreements (*id.,* ¶ 140); "impose[d]" an exclusive dealing contract on NxStage Medical, a supplier of home-care hemodialysis equipment, under which NxStage was prevented from selling to ARA's patients (*id.,* ¶ 141); "impose[d] or attempt[ed] to impose" an exclusivity agreement on "a very large healthcare insurer," under which the insurer would only reimburse for use of TRC's dialysis centers (*id.,* ¶ 142); provided patient-retention bonuses to TRC employees (*id.,* ¶ 143), and threatened ARA executives (*id.,* ¶ 144).  ARA asserted four specific antitrust claims : (1) unlawful monopolization; (2) unlawful attempted monopolization; (3) unlawful conspiracy to monopolize; and (4) unreasonable restraint of trade.  (*Id.,* ¶¶ 145-161.)

TRC moved to dismiss each counterclaim, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim.  (Doc. # 88.)

## STANDARD OF REVIEW

A complaint or, in this case, counterclaim must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S.

at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556).  "Plausible" does not mean "probable," and the court must still accept alleged facts as true, but the pleading must assert "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*

Importantly, the degree of specificity needed to plausibly assert a claim is contextual.  *Robbins v. Okla.*, 519 F.3d 1242, 1248 (10th Cir. 2008) ("'Context matters in notice pleading.  Fair notice under Rule 8(a)(2) depends on the type of case . . . .'" (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 231-32 (3d Cir. 2008))); *see also Iqbal*, 129 S. Ct. at 1950 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").  This is because without some explanation of the conduct that assertedly violates the law – an explanation that will necessarily vary with the complexity of the claim asserted – the defendants cannot have the requisite "'fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *see also Airborne Beepers & Video, Inc. v. AT & T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007) ("[A]t some point the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8." (cited favorably in *Robbins*, 519 F.3d at 1248)).

5

But the requirements of "plausibility" and "fair notice," even in a complex case, neither vitiate Rule 8's "short and plain statement" rule nor impose a heightened fact pleading standard.  *See Twombly*, 550 U.S. at 570 ("[W]e do not require heightened fact pleading of specifics . . . .").  Further, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable and that recovery is very remote and unlikely."  *Id.* at 556 (quotations omitted).  The critical question is, "assum[ing] the truth of all well-pleaded facts . . . and draw[ing] all reasonable inferences therefrom in the light most favorable to the plaintiffs," whether the complaint "'raise[s] a right to relief above the speculative level.'"  *Dias v. City & County of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (quoting *Twombly*, 550 U.S. at 555).

## ANALYSIS

TRC moves to dismiss ARA's counterclaims under a variety of theories, some of which apply to more than one claim.  The Court first outlines the relevant background principles of antitrust law, and then proceeds to analyze each of TRC's arguments in turn to determine if the counterclaims plausibly state a claim for relief.

## I.      BACKGROUND ANTITRUST PRINCIPLES

ARA's counterclaims all fall under either Section 1 or Section 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2.  The Sherman Act, enacted "in the era of 'trusts' and of 'combinations' of businesses and of capital organized and directed to control of the market by suppression of competition," *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 491 (1940), was "designed to protect market participants from anticompetitive behavior in

the marketplace." *Elliot Indus. Ltd. P'ship v. BP Am.*, 407 F.3d 1091, 1124 (10th Cir.

2005).  The Sherman Act does not punish any and all behavior that harms a competitor.

Rather, "the Act's basic objectives [are] the protection of a competitive process that

brings to consumers the benefits of lower prices, better products, and more efficient

production methods." *Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 486

(1st Cir. 1988) (cited favorably in *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 963

(10th Cir. 1994)).  "[I]t is the impact upon competitive conditions in a definable market

which distinguishes the antitrust violation from the ordinary business tort."  *Tanaka v.

Univ. of S. Cal.*, 252 F.3d 1059, 1064 (9th Cir. 2001).

Section 1 of the Act targets concerted action, prohibiting all "contract[s],"

"combination[s]," or "conspirac[ies]" that are "in restraint of trade or commerce."

15 U.S.C. § 1.  Unlike Section 1, Section 2 prohibits certain unilateral conduct:

"monopoliz[ing]," and "attempt[ing] to monopolize."  15 U.S.C. § 2.  Section 2 also

reaches collective action: "conspir[ing] with any other person or persons, to

monopolize."  *Id.*  Simply being a monopoly is not barred by the act; "the possession

of monopoly power will not be found unlawful unless it is accompanied by an element

of anticompetitive **conduct**."  *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko,

LLP*, 540 U.S. 398, 407 (2004) (emphasis in original); *see also TV Commc'ns Network,

Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1024-25 (10th Cir. 1992)

("Conduct violates [Section 2] where an entity acquires or maintains monopoly power in

such a way as to preclude other entities from engaging in fair competition.").  In addition

to other enforcement mechanisms, parties sufficiently injured by prohibited conduct may sue for damages – trebled, by statute – for violation of either section.  15 U.S.C. § 15(a).

ARA's first three counterclaims assert violations of the three components of Section 2: monopolization, attempted monopolization, and conspiracy to monopolize. A monopolization claim has two elements: "'(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power.'" *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1192 (10th Cir. 2009) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)).  An attempted monopolization claim requires a plaintiff to show "'(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'"  *Id.* (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)).  Like a monopolization claim, attempted monopolization requires "'consider[ation] [of] the relevant market and the defendant's ability to lessen or destroy competition in that market.'" *Christy Sports*, 555 F.3d at 1192 (citing *Spectrum Sports*, 506 U.S. at 456) (alteration in original). "Conspiring to monopolize is a separate offense under section 2, requiring less in the way of proof than the other section 2 offenses."  *Monument Builders of Greater Kan. City, Inc. v. Am. Cemetery Ass'n of Kan.*, 891 F.2d 1473, 1484 (10th Cir. 1989) (quotations and citations omitted).  To plead a conspiracy to monopolize claim,

"[a] plaintiff must show conspiracy, specific intent to monopolize, and overt acts in furtherance of the conspiracy."  *Id.*[2]

ARA's final counterclaim is for violation of Section 1 of the Sherman Act. "To state a claim for a violation of section one the plaintiff must allege facts which show: the defendant entered a contract, combination or conspiracy that unreasonably restrains trade in the relevant market."  *TV Commc'ns Network*, 964 F.2d at 1027. Critical to a Section 1 analysis is the determination of whether the challenged conduct "constitutes a *per se* violation of the statute" or whether the conduct should be analyzed to see if it "create[s] an **unreasonable** restraint of trade" – the so-called "rule of reason." *Id.* (emphasis in original).  The *per se* rule is cautiously applied, as it deems conduct illegal without requiring a detailed market or economic analysis.  *See Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289 (1985) ("This *per se* approach permits categorical judgments with respect to certain business practices that have proved to be predominantly anticompetitive.").  The parties agree that the conduct here should be analyzed under the rule of reason.  (*See* Doc. # 88 at 9; Doc. # 93 at 12.)  The rule of reason "'requires the factfinder to weigh all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an

---

[2]   Some Tenth Circuit cases list as an additional element that the conspiracy must have had an effect on interstate commerce.  *See, e.g.*, *Lantec, Inc. v. Novell, Inc.*,  306 F.3d 1003, 1028 (10th Cir. 2002) ("According to Tenth Circuit case law, a conspiracy to monopolize claim requires proof of '(1) the existence of a combination or conspiracy to monopolize; (2) overt acts done in furtherance of the combination or conspiracy; (3) an effect upon an appreciable amount of interstate commerce; and (4) a specific intent to monopolize.'" (quoting *TV Commc'ns Network*, 964 F.2d at 1026)).  Because this "effect on commerce" element is not at issue in the present motion, the Court need not reconcile these different descriptions of the claim.

unreasonable restraint on competition.'" *Gregory v. Fort Bridger Rendezvous Ass'n*, 448 F.3d 1195, 1203 (10th Cir. 2006) (quoting *Diaz v. Farley*, 215 F.3d 1175, 1182 (10th Cir. 2000)).

## II.   ARGUMENTS FOR DISMISSAL

With these standards in mind, the Court turns to an analysis of each of TRC's arguments for dismissal of ARA's counterclaims.

### A.   Standing

TRC contends that ARA lacks standing to bring any of its claims because it has failed to properly allege either the constitutionally-required "injury-in-fact" or the statutorily-required "antitrust injury." (Doc. # 88 at 13-19.) In order for any plaintiff to have standing to sue in federal court, she must allege, among other things, an injury that is "concrete and particularized" and "actual or imminent." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). This constitutional injury-in-fact requirement (like all constitutional standing requirements) is jurisdictional; it must be present before a court may proceed to the merits of a dispute. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998). An antitrust plaintiff faces an additional, "more rigorous" standing requirement: she must demonstrate "antitrust standing," which includes a showing of "antitrust injury." *Tal v. Hogan*, 453 F.3d 1244, 1253 (10th Cir. 2006). Antitrust injury is "an 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful.'" *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).

Antitrust standing is not "jurisdictional" in the way that constitutional standing is. *See, e.g.*, *Gerlinger v. Amazon.com Inc., Borders Group, Inc.*, 526 F.3d 1253, 1256 (9th Cir. 2008) ("Lack of antitrust standing affects a plaintiff's ability to recover, but does not implicate the subject matter jurisdiction of the court."); *In re Lorazepam & Clorazepate Antitrust Litig.*, 289 F.3d 98, 107-08 (D.C. Cir. 2002) ("Unlike constitutional standing, this court's jurisdiction does not turn on antitrust standing."). However, antitrust standing – and more specifically, antitrust injury – is a "threshold inquiry in analyzing whether a plaintiff may pursue an antitrust claim." *Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249, 1267 (10th Cir. 2006); *cf. B-S Steel Of Kansas, Inc. v. Texas Indus., Inc.*, 439 F.3d 653, 667 (10th Cir. 2006) ("In order to make the necessary threshold showing of entitlement to injunctive relief, a plaintiff must show a threat of antitrust injury . . . .") (quotations and citations omitted). The Court therefore considers these related "injury" issues before turning to the merits of the counterclaims.

ARA has adequately pled constitutional "injury-in-fact." TRC segregates the various allegations in the complaint and attempts to demonstrate that each allegation, taken alone, fails to establish injury. (Doc # 88 at 15-19.) However, reading the counterclaims as a whole, ARA has alleged that TRC's actions, including preventing ARA from hiring key personnel and locking a key supplier of hemodialysis equipment into an exclusive contract, has led to the loss of ARA's "patients, revenues and profits." (Doc. # 79, ¶¶ 136-137, 139, 141, 148, 154.) While each and every allegation may not necessarily demonstrate an impact on ARA, the gravamen of the counterclaims is that

TRC's improper conduct has harmed ARA's bottom line.  This is sufficient to plead

injury-in-fact.  *Hydro Res., Inc. v. EPA*, 562 F.3d 1249, 1259 (10th Cir. 2009)

("[E]conomic injury . . . surely confers standing.").

ARA's allegations also demonstrate antitrust injury.  Again, this requirement

insists on a connection between the alleged injury and the purpose of the antitrust laws

themselves.  *Tal*, 453 F.3d 1253.  This connection

> ensures that the harm claimed by the plaintiff corresponds to the rationale
> for finding a violation of the antitrust laws in the first place, and it prevents
> losses that stem from competition from supporting suits by private
> plaintiffs for either damages or equitable relief.

*Atl. Richfield Co. v. USA Petroleum Co.*,  495 U.S. 328, 342 (1990).  Put another way,

"[t]he antitrust injury requirement ensures that a plaintiff can recover only if the loss

stems from a competition-**reducing** aspect or effect of the defendant's behavior."  *Id.* at

344 (emphasis in original).  The allegations in this case meet this test.  ARA contends

that TRC abused its monopoly power to, for example, unfairly prevent its staff from

considering employment with a competitor and force suppliers into exclusive dealing

agreements.  (Doc. # 79, ¶¶ 136-137, 139, 141, 147, 151, 156, 161.)  ARA further

contends that it lost patients and profits as a result of this anticompetitive behavior.

(*Id.*, ¶¶ 148, 154, 159, 161.)  This is not a case where ARA's loss is caused by

increased competition, but rather by TRC's alleged attempts to eliminate a competitor

and thus lessen competition.  At least at the pleading stage, these allegations are

sufficient to show antitrust injury.  *See* 2 Philip E. Areeda & Herbert Hovenkamp,

*Antitrust Law* (hereinafter "Areeda & Hovenkamp"), ¶ 348d1 ("Standing is clear . . .

when the plaintiff alleges that its rival engaged in an exclusionary practice designed to rid the market of the plaintiff or to preclude its entry, so that the defendant could maintain or create a monopoly.").

TRC suggests that ARA must further allege harm to "competition as a whole." (Doc. # 88 at 13.)  The question of whether antitrust injury requires a showing of harm to competition generally has engendered some confusion, likely because the term "antitrust injury" is sometimes also used to describe the market injury element of a **substantive** rule of reason analysis.  *See* William C. Holmes, *Antitrust Law Handbook* § 9:8 (2008).  The better rule appears to be that injury to competition is not a necessary element of the plaintiff-specific standing analysis.  *Id.*; *see also Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 275 n.2 (3d Cir. 1999) ("The District Court erred by incorporating the issue of anticompetitive market effect into its standing analysis, confusing antitrust injury with an element of a claim under section 1 of the Sherman Act . . . ."); *Doctor's Hosp. v. Se. Med. Alliance, Inc.*, 123 F.3d 301, 305 (5th Cir. 1997) (noting the "distinction between antitrust injury and injury to competition, the latter of which is often a component of substantive liability," and reiterating that "the antitrust laws do not require a plaintiff to establish a market-wide injury to competition as an element of standing").  However, several cases, including some from the Tenth Circuit, seem to suggest that general competitive harm is relevant to the antitrust injury analysis.  *See Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1124-25 (10th Cir. 2005) (noting that alleged injury from underpayment of oil and gas royalties

was "not an antitrust injury because it had no adverse effect on competition or consumers"); *Full Draw Prod. v. Easton Sports, Inc.*, 182 F.3d 745, 754 (10th Cir. 1999) (discussing, in the context of antitrust injury, the loss of competition in the market generally).  The Court need not resolve this issue, however, because even assuming allegations of harm to consumers or competition are necessary, ARA has sufficiently pled such harm.

ARA asserts that TRC's monopolistic actions have reduced ARA's ability to survive in the marketplace.  (Doc. # 93 at 18.)  Reduced consumer choice as a result of monopolistic behavior is the sort of harm to competition that the antitrust laws were intended to prevent.  *See Full Draw*, 182 F.3d at 754.  ARA further alleges that TRC itself has acknowledged the benefits to its customers – in the way of facility upgrades and better amenities for patients – that competition from ARA has prompted.  (Doc. # 79, ¶¶ 127-28.)  It is reasonable to infer from these allegations that, if TRC succeeds in driving ARA out of the market, it will no longer need to provide such amenities and thus consumers will be left with a suboptimal product.  Moreover, just because ARA has not yet been driven out of the market does not deprive it of the ability to recover under the antitrust laws.  *See Brunswick Corp.*, 429 U.S. at 489 & n.14 (noting that a plaintiff need not "prove an actual lessening of competition" to show antitrust injury; "[C]ompetitors may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened.").  For these reasons, ARA sufficiently alleges competitive harm.

B.   Relevant Market

TRC also argues that the counterclaims fail to properly plead the relevant product and geographic markets.  (Doc. # 88 at 24-29.)  Like TRC's argument concerning ARA's standing, TRC contends that this failure is fatal to each of ARA's four counterclaims. (*Id.*)

Properly defining the relevant market is often critical to an antitrust claim. "A firm with a large share of a properly defined market likely has market power," Herbert Hovenkamp, *Federal Antitrust Policy* § 3.2 (3d ed. 2005), and "[m]any antitrust violations require the plaintiff to show that the defendant has some market power," *id.* § 3.1.  Thus "[w]ithout a definition of [the relevant] market there is no way to measure [a defendant's] ability to lessen or destroy competition."  *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965).

As a threshold matter, ARA disagrees that market definition is necessary to plead a claim for conspiracy to monopolize.  (Doc. # 93 at 11.)  TRC acknowledges that the Tenth Circuit has so held, *see Salco Corp. v. General Motors Corp.*, 517 F.2d 567, 576 (10th Cir.1975) ("Specific intent to monopolize is the heart of a conspiracy [to monopolize] charge, and a plaintiff is not required to prove what is the 'relevant market.'"), but contends that the Supreme Court's reasoning in the post-*Salco* decision *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993), essentially abrogated *Salco* and required proof of market in all Section 2 cases.  (Doc. # 95 at 4-5.)  *Spectrum Sports*, however, was an **attempted** monopolization case, and its holding was

15

specifically limited to such a claim.  506 U.S. at 459 ("[D]emonstrating the dangerous

probability of monopolization in an attempt case also requires inquiry into the relevant

product and geographic market and the defendant's economic power in that market.").

Further, since *Spectrum Sports* was decided, courts have noted the split on the issue of

whether market definition is required in a conspiracy to monopolize claim – and have

placed the Tenth Circuit on the side holding it is not.  *See, e.g.*, *Fraser v. Major League

Soccer, LLC,* 284 F.3d 47, 67 (1st Cir. 2002) ("[A] majority of courts that have touched

the issue have said . . . that proof of a relevant market, and hence, market power, is not

required in a conspiracy to monopolize claim." (citing *Salco*, 517 F.2d at 576))).  Indeed,

the Tenth Circuit has, in the last several years, expressly declined to reconsider its

holding in *Salco* (albeit without referencing the *Spectrum Sports* decision).  *Lantec*, 306

F.3d at 1024 n.10 (noting the circuit split but declining to reconsider its position because

the parties did not argue it and because "we are bound by our precedent and therefore

need not revisit this rule").  If *Salco* is to be overruled, it is the Tenth Circuit's

prerogative, and not this Court's, to do so.  *United States v. Spedalieri*, 910 F.2d 707,

709 (10th Cir. 1990) (district court bound to follow circuit court precedent).  Thus,

pleading a relevant market is necessary only for ARA's first (monopolization), second

(attempted monopolization), and fourth (unreasonable restraint of trade) counterclaims.

    However, as to those claims, "[f]ailure to allege a legally sufficient market is

cause for dismissal."  *Campfield*, 532 F.3d at 1118.  This pleading requirement

demands more than a cursory mention of a relevant product and geographic market.

16

A plaintiff must specifically define the product market by reference to "the reasonable interchangeability of use or the cross-elasticity of demand between the product [in question] and substitutes for it." *Brown Shoe Co v. United States*, 370 U.S. 294, 325 (1962). "Reasonable interchangeability" and "cross-elasticity" are essentially synonymous; the focus is on whether there are substitute products such that when the price of product A goes up, consumers switch to product B. *See Telecor Comm'cns, Inc v. Sw. Bell*, 305 F.3d 1124, 1131 (10th Cir. 2002). Defining the geographic market is equally important, as it marks "the area of effective competition" – "the narrowest market which is wide enough so that products from adjacent areas cannot compete on substantial parity with those included in the market." *Lantec*, 306 F.3d at 1026-27 (quotations and citations omitted). In short,

> [t]o define a market in product and geographic terms is to say that if prices were appreciably raised or volume appreciably curtailed for the product within a given area, while demand held constant, supply from other sources could not be expected to enter promptly enough and in large enough amounts to restore the old price and volume.

*SCFC ILC*, 36 F.3d at 966 (quoting *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210 (D.C. Cir. 1986)). Given the importance of a proper market definition, then,

> "[w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand . . . even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted."

*Campfield*, 532 F.3d at 1118 (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436-37 (3d Cir.1997)).

ARA's counterclaims allege that the Denver metropolitan area is the relevant geographic market, and "[t]he provision of dialysis services and the operation of kidney dialysis clinics" is the relevant product market.  (Doc. # 79, ¶¶ 116-117.)  TRC is alleged to control 80% of this market.  (*Id.,* ¶ 118.)  But there is no reference – in name or in substance – to product interchangeability or cross-elasticity.  Even in response to TRC's motion to dismiss, ARA does not provide any firm allegations of the factors necessary to evaluate the market, stating simply that it "believes" it has defined an adequate market based on its "experience."  (Doc. # 93 at 7.)  Without such allegations, it is impossible to determine whether TRC has sufficient market power to risk harming competition.  For example, as TRC argues, it is possible that in-home kidney dialysis is a reasonably interchangeable product, and that including this product in the market would affect the assessment of TRC's true market power.  (Doc. # 88 at 28-29.)  This is not to say, as ARA contends, that it must prove that its market definition is proper at this stage of the proceedings.  (Doc. # 93 at 7.)  Rather, ARA must sufficiently plead the market with specific reference to the relevant factors.  ARA has not done so.

ARA's failure to properly allege the relevant market compels the Court to dismiss its monopolization, attempted monopolization, and Section 1 unreasonable restraint of trade claims.  However, as this is essentially a pleading deficiency, the dismissal will be

without prejudice.  In the interest of efficiency and judicial economy, the Court will proceed to consider TRC's remaining arguments for dismissal.

      C.    <u>Entry Barriers</u>

      Related to its market definition argument, TRC contends that ARA failed to sufficiently allege barriers to entry in the market.  (Doc. # 88 at 29-30.)  Like market definition, entry barriers – "particular characteristics of a market which impede entry by new firms into that market" – are relevant to the assessment of market power.  *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 967-68 (10th Cir. 1990). "If entry barriers are substantial, a market participant may be able to achieve or maintain market or monopoly power and use that power anticompetitively because its actions can go unchecked by new competitors."  *Id.* at 974.

      Unlike the specifics of the relevant market, it is not clear that entry barriers must be specifically pled or proved in order for an antitrust plaintiff to recover.  *Compare Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007) ("To support an inference of monopoly power, a plaintiff typically must plead and prove that a firm has a dominant share in a relevant market, and that significant 'entry barriers' protect that market.") *with Shoppin' Bag of Pueblo, Inc. v. Dillon Co.*, 783 F.2d 159, 161-62 (10th Cir. 1986) ("At the very least it must be shown how much of the relevant market a defendant controls if market power is to be evaluated.  Of course, other conduct or circumstances may also be considered.  Many cases also look at market trends,

number and strength of other competitors, and entry barriers.") (citations omitted). But assuming that entry barriers are required, ARA has adequately alleged them.

For example, ARA asserts that TRC employs the "vast majority" of dialysis nurses and technicians (Doc. # 79, ¶ 120), that there is a "severe" nursing shortage that is particularly serious for dialysis nurses (*Id.,* ¶ 120), that it takes significant time to train a nurse and have that nurse be able to function on their own in the clinic (*id.,* ¶ 121), and that, with ARA's entry into the market, TRC and ARA are competing for "the same very, very tiny pool of teammates, especially nurses" (*id.,* ¶ 123).  The limited availability of adequate staff is certainly an entry barrier.  The inability to hire essential personnel could dissuade a prospective competitor from entering the market if the incumbent firm begins monopoly pricing.  *See Chicago Bridge & Iron Co. v. FTC*, 534 F.3d 410, 439 (5th Cir. 2008) ("Control of essential or superior resources is a recognized barrier to entry.  Employee skill levels required for a firm to be successful can be considered a barrier to entry." (citing *Image Technical Serv., Inc. v. Eastman Kodak, Co.*, 125 F.3d 1195, 1208 (9th Cir.1997); *In re IBM Peripheral EDP Devices Antitrust Litig.*, 481 F. Supp. 965, 976 (N.D. Cal.1979))).  Nor does the fact that ARA has, in fact, entered the market dispose of the question of entry barriers.  *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1104 (D. Colo. 2004) ("[T]he fact that entry has occurred does not preclude the existence of significant entry barriers." (citing *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1440 (9th Cir. 1995))).

The allegations of a significant shortage of key personnel necessary to operate competitive clinics are sufficient to show barriers to entry.

      D.    *Noerr-Pennington* Immunity

Unlike the preceding arguments, which take aim at basic, structural problems of the pleadings, TRC's remaining arguments attack certain specific allegations of its purportedly anticompetitive conduct.

First, TRC contends that the allegations concerning its litigation tactics cannot form the basis for an antitrust claim under the *Noerr-Pennington* doctrine.  (Doc. # 88 at 9-12.)  TRC concedes that this argument applies only to ARA's first (monopolization), second (attempted monopolization), and fourth (unreasonable restraint of trade) counterclaims.  (*Id.* at 4.)

The *Noerr-Pennington* doctrine – which derives from the Supreme Court's decisions in *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) and *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965) – provides that individuals who petition the government, even for ostensibly anticompetitive action, are protected from antitrust liability.  *See, e.g.*, *City of Columbia v. Omni Outdoor Adver.*, 499 U.S. 365, 379-80 (1991).  The doctrine applies to litigation activities.  *See, e.g.*, *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).  However, the doctrine does not shield a petitioner whose actions are "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor."  *Noerr*, 365 U.S. at 144.

The Supreme Court first explained the sham exception in the litigation context in *California Motor Transport*. The Court held that, where the defendants were alleged to have instituted various adjudicative proceedings "with or without probable cause, and regardless of the merits of the cases," the proceedings fell within the sham exception to *Noerr-Pennington*. 404 U.S. at 512. The Court went on to note that "a pattern of baseless, repetitive claims may . . . lead[ ] the factfinder to conclude that the administrative and judicial processes have been abused," and that in such an instance, "abuse of those processes produced an illegal result." *Id.* at 513. Years later, the Court again elaborated on the sham litigation exception, establishing a two-part test:

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits . . . . Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor through the use of the governmental process – as opposed to the outcome of that process – as an anticompetitive weapon.

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60-61 (1993) (citations and alterations omitted).

ARA alleges that TRC has engaged in sham litigation activity aimed at hindering ARA's successful entry into the market. ARA contends that TRC, upon learning of ARA's plan to open competing dialysis centers, filed suit against ARA and sought a sixty-day preliminary injunction during which it could lock TRC's staff into long term contracts without interference from ARA. (Doc. # 79, ¶¶ 135, 137-38.) ARA further contends that TRC "has pursued, and continues to pursue, sham litigation against

22

several of its former employees," suing them to enforce covenants not to compete that, ARA alleges, are illegal and unenforceable.  (*Id., ¶¶* 139-140.)  ARA asserts that "these lawsuits are objectively baseless under Colorado law and are utilized merely as an anticompetitive weapon to interfere with ARA's efforts to compete."  (*Id., ¶* 140.)

ARA claims that because its allegations involve a pattern of baseless litigation, it is not required to satisfy the *Professional Real Estate Investors* strict two-prong test with respect to each individual suit.  Instead, ARA argues its allegations survive *Noerr-Pennington* immunity so long as they show that TRC acted without regard to the merits and with the intent to hinder competition.  (Doc. # 93 at 15-16.)  It appears that most courts to have considered this issue agree with ARA's position.  For example, in *USS-POSCO Indus. v. Contra Costa County Bldg. & Constr. Trade Council*, 31 F.3d 800 (9th Cir. 1994), the Ninth Circuit "reconcile[d]" *California Motor Transport* and *Professional Real Estate Investors* by "reading them as applying to different situations." *Id.* at 810.

> *Professional Real Estate Investors* provides a strict two-step analysis to assess whether a single action constitutes sham petitioning.  This inquiry is essentially retrospective: If the suit turns out to have objective merit, the plaintiff can't proceed to inquire into subjective purposes, and the action is perforce not a sham.
>
> *California Motor Transport* deals with the case where the defendant is accused of bringing a whole series of legal proceedings.  Litigation is invariably costly, distracting and time-consuming; having to defend a whole series of such proceedings can inflict a crushing burden on a business.  *California Motor Transport* thus recognized that the filing of a whole series of lawsuits and other legal actions without regard to the merits has far more serious implications than filing a single action, and can serve as a very effective restraint on trade.  When dealing with a series of

23

lawsuits, the question is not whether any one of them has merit – some may turn out to, just as a matter of chance – but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival.  The inquiry in such cases is prospective: Were the legal filings made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment?

*Id.* at 810-11 (citations omitted).  Other courts have endorsed this reasoning as well.

*Primetime 24 Joint Venture v. Nat'l Broad. Co.*, 219 F.3d 92, 101 (2d Cir. 2000)

("In cases in which 'the defendant is accused of bringing a whole series of legal

proceedings,' the test is not 'retrospective' but 'prospective' . . . ." (quoting *USS-POSCO*

*Indus.*, 31 F.3d at 811)); *Livingston Downs Racing Ass'n Inc. v. Jefferson Downs Corp.*

192 F. Supp. 2d 519, 538-39 (M.D. La. 2001) (adopting the *USS-POSCO* test); *but see*

*Christian Mem'l Cultural Ctr., Inc. v. Michigan Funeral Dirs. Ass'n*, 998 F. Supp. 772,

777 (E.D. Mich. 1998) (finding that *USS-POSCO* read *Professional Real Estate*

*Investors* too narrowly and suggesting that the two-prong test applies to multiple

lawsuits).  A recent report by the staff of the Federal Trade Commission similarly

concluded that *Professional Real Estate Investors* left open the question of how the

sham exception applies to a series of petitions, and endorsed the *USS-POSCO*

approach.  *Enforcement Perspectives on the* Noerr-Pennington *Doctrine* 28-36

(2006), available at http://www.ftc.gov/reports/P013518enfperspectNoerr-Pennington

doctrine.pdf; *see also id.* at 29 ("[A] 'pattern' exception to *Noerr* should apply when a

party invokes administrative processes, judicial processes, or a combination thereof,

to hinder marketplace rivals.").

24

Neither party cites, nor has this Court found, any Tenth Circuit case analyzing whether the *Professional Real Estate Investors* test applies to allegations of "pattern" litigation.  In the absence of binding authority, the Court agrees with the reasoning of cases like *USS-POSCO*.  Where the alleged anticompetitive conduct is a series of lawsuits intended to harass and burden a competitor, it cannot be that the offender escapes antitrust liability simply because one or two of those suits turns out to have merit.  *See USS-POSCO Indus.*, 31 F.3d at 811 ("[T]he fact that a small number in the series of lawsuits turn out not to be frivolous will not be fatal to a claim under *California Motor Transport*; even a broken clock is right twice a day.").  Therefore, the Court considers, not whether each and every suit in the series is, retrospectively, "objectively baseless," but rather whether, prospectively, the lawsuits were brought "without regard to the merits and for the purpose of injuring a market rival."  *Id.*

Under this standard, ARA's allegations survive.  As noted above, ARA alleges that TRC has filed several lawsuits against ARA and against TRC's former employees, all designed to interfere with ARA's efforts to compete with TRC.  ARA has further alleged that TRC is suing its former employees to enforce plainly illegal noncompete agreements.  These allegations sufficiently demonstrate a pattern of litigation brought essentially for the purpose of harassment and not, as required by *Noerr-Pennington*, out of a genuine interest in redressing grievances.

TRC argues that, even accepting the *USS-POSCO* "pattern" analysis, ARA's pleadings are still deficient.  TRC first argues that ARA has failed to assert how many

25

lawsuits make up the "pattern," making application of *USS-POSCO* inappropriate.  (Doc. # 95 at 9.)  It is true that the "pattern" analysis does not necessarily apply anytime more than one "sham" suit is alleged; a small number of lawsuits may still require application of the *Professional Real Estate Investors* test.  *Compare USS-POSCO Indus.*, 31 F.3d at 811 (twenty-nine lawsuits potentially a "pattern") *with Amarel v. Connell*, 102 F.3d 1494, 1519 (9th Cir. 1996) (two lawsuits not a "pattern" and therefore *Professional Real Estate Investors* applied).  But TRC points to no case holding that an antitrust plaintiff must allege the specific number of suits filed.  This case is before the Court on TRC's motion to dismiss, in which facts are taken in ARA's favor and reasonable inferences drawn therefrom.  The allegations of "several" suits against former employees is enough, at the pleading stage, to give TRC fair notice of ARA's theory and the facts on which it rests.

TRC further contends that ARA failed to allege the outcome of the alleged pattern of meritless litigation.  (Doc. # 79 at 9.)  But allegations of outcome are not necessary under *USS-POSCO*.  Again, the inquiry is prospective – the critical question is whether, at the outset of the litigation, TRC filed suit without regard for the merits of its claims.  This is not to say that, if discovery proves that many or most of the lawsuits were meritorious, TRC could not successfully move for summary judgment.  *See USS-POSCO Indus.*, 31 F.3d at 811 (fact that fifteen of twenty-nine lawsuits were successful precludes invocation of sham exception; "The fact that more than half of all the actions as to which we know the results turn out to have merit cannot be reconciled with the

charge that the unions were filing lawsuits and other actions willy-nilly without regard to success."). But again, at the pleading stage, ARA's allegations of numerous, meritless lawsuits is sufficient to survive a motion to dismiss.

Finally, TRC attempts to distinguish *USS-POSCO* on the ground that, in this case, most of the suits are between TRC and its employees; only one of the lawsuits specifically involves ARA. (Doc. # 95 at 10.) The Court does not find this argument persuasive. The litigation against TRC's employees is alleged to have been initiated for the purpose of preventing ARA from hiring adequate staff and therefore competing with TRC. (Doc. # 79, ¶ 140.) "Sham" litigation need not always involve the targeted competitor as a named party. Rather, the question is whether the suits were brought "for the purpose of injuring a market rival." *USS-POSCO Indus.*, 31 F.3d at 811. ARA's allegations meet this test.

For all of these reasons, ARA's allegations concerning TRC's legal activities fall within the "sham" exception for pattern litigation. *Noerr-Pennington* therefore does not provide a basis for dismissing ARA's claims.

E.     Predatory Hiring

Like the allegations concerning TRC's litigation activities, TRC argues that ARA's claims of improper hiring and retention of health care professionals cannot support ARA's antitrust claims. (Doc. # 88 at 21-24.) And like the litigation activity claims, TRC notes that this argument applies only to ARA's first (monopolization), second

(attempted monopolization), and fourth (unreasonable restraint of trade) counterclaims. (*Id.* at 4.)

A firm's hiring of key talent can reduce its rivals' ability to compete and thus risk harming competition generally. *See* Areeda & Hovenkamp, ¶ 702a. On the other hand, "[t]here is a high social and personal interest in maintaining a freely functioning market for talent. . . . [W]e greatly value the individual's freedom to enjoy whatever employment opportunities the market offers." *Id.,* ¶ 702b. Courts are rightly cautious in imposing antitrust liability for a firm's hiring practices. *See Wichita Clinic, P.A. v. Columbia/HCA Healthcare Corp.*, No. 96-1336, 1997 WL 225966, *9 (D. Kan. April 8, 1997) ("[T]he courts have examined more closely claims of anticompetitive hiring than other forms of anticompetitive conduct.").

Both parties rely primarily on a predatory hiring decision from the Ninth Circuit, *Universal Analytics v. MacNeal Schwendler Corp.*, 914 F.2d 1256 (9th Cir. 1990).[3] The *Universal Analytics* outlined the predatory hiring analysis as follows:

> Unlawful predatory hiring occurs when talent is acquired not for purposes of using that talent but for purposes of denying it to a competitor. Such cases can be proved by showing the hiring was made with such predatory intent, *i.e.* to harm the competition without helping the monopolist, or by showing a clear nonuse in fact. . . .

---

[3]   *Universal Analytics* specifically involved a company's hiring of employees away from a rival rather than, as in this case, a company allegedly "locking up" its own employees to keep them from moving to another firm. 914 F.2d at 1257. The parties do not cite, nor has this Court found, any case discussing preemptive, predatory "lock-up" rather than predatory hiring of a rival's employees. However, the Court finds the two situations analogous. In both circumstances, the defendant seeks to prevent a rival from competing by denying that rival key employees. Thus, the Court finds the *Universal Analytics* analysis relevant to the facts of this case.

> Acquiring talent not to use it but to deny it to possible rivals
> is exclusionary.  Such an arrangement has the same harmful
> tendency and the same lack of redeeming virtue as the
> promise by a non-employee that he will not compete with the
> monopolist.  But unlike the latter agreement whose existence
> or nonexistence is a rather clear-cut question, exclusionary
> employment would be hard to identify.  A monopolist would
> probably use important talent once acquired.  And the court
> should not try to judge whether the acquired talent was used
> more effectively than readily available alternative personnel.
> Nor should it try to do so when the defendant pursues a
> hard-to-match, if not unmatchable, program of recruiting,
> say, young researchers in his field.  In the absence,
> therefore, of the monopolist's proved subjective intent to hire
> talent preclusively or of clear non-use in fact, employment
> should not be held exclusionary.

*Id.* at 1258 (quoting Areeda & Hovenkamp, ¶ 702).  Under this construct, the court

found that plaintiff's claims of predatory hiring could not stand.  Although there was

evidence that the defendant hired employees away from the plaintiff in order to "wound"

its rival, the evidence demonstrated that the "primary motivation" in the hiring was to put

the employees to productive use.  *Id.* at 1259.  As the defendant had "legitimate

business reasons" for hiring plaintiff's employees, its conduct did not violate the antitrust

laws.  *Id.*

ARA contends that TRC "has attempted and succeeded in tying up doctors and

nurses with illegal noncompete agreements, not to expand [TRC's] business . . . , but to

keep them from staffing the ARA clinics."  (Doc. # 93 at 21.)  But ARA's own allegations

belie this claim.  ARA alleged that TRC executives described a "'severe' and 'terrible'

nursing shortage that is 'extensively bad in Colorado' and particularly 'serious' for

dialysis nurses."  (Doc. # 79, ¶ 120.)  Moreover, ARA claims that TRC asserted that its

turnover rate is twenty percent, that "it takes 10 to 12 weeks to train a nurse," and that

"they can't be along in the unit for six months after they're trained." (*Id.,* ¶ 121.)  ARA

cites a TRC executive who testified that "[b]ecause of the shortage in the market, what

we're now dealing with is five more centers to compete with the same very, very tiny

pool of teammates, especially nurses." (*Id.,* ¶ 123.)  Finally, ARA alleges that TRC tried

to lock up its staff "to hopefully allow these people to not want to leave us and go with

ARA." (*Id.,* ¶ 136.)  Even viewing these facts and drawing all inferences in ARA's favor,

the allegations demonstrate a clear business reason – the serious shortage of qualified

nurses and the significant time to train and deploy them – for TRC to take all possible

measures to retain its staff.  As there is no plausible claim that TRC locked up its staff to

"harm the competition **without helping [itself]**," *Universal Analytics*, 914 F.2d at 1258

(emphasis added), ARA's predatory hiring allegations cannot stand.  This is more than a

pleading deficiency.  If ARA chooses to re-file its counterclaims, it cannot use its

allegations of TRC's locking up its employees to support its claims.

     F.    <u>Conspiracy Claims</u>

     Finally, TRC asserts two related arguments as to why ARA's third (conspiracy

to monopolize) and fourth (unreasonable restraint of trade) counterclaims must be

dismissed.  First, TRC claims that DaVita and its wholly-owned subsidiary, Total Renal

Care, could not as a matter of law conspire to violate the antitrust laws.  (Doc. # 88 at

12-13.)  Relatedly, TRC contends that ARA's conspiracy to monopolize claim fails

because there are no allegations of a common purpose or specific intent to monopolize among the alleged participants.  (*Id.* at 19-21.)

       1.    *Parent-Subsidiary Liability*

ARA's Section 2 conspiracy to monopolize and Section 1 unreasonable restraint of trade claims both require collective action.  ARA concedes, as it must, that a parent and subsidiary cannot conspire in violation of Section 1.  *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 777 (1984) (holding that a parent corporation and its wholly-owned subsidiary "are incapable of conspiring with each other for purposes of § 1 of the Sherman Act").  However, ARA claims that this rule is not so clear in the context of a section 2 conspiracy to monopolize charge.  (Doc. # 93 at 17.) ARA relies on a recent decision of this Court, *Climax Molybdenum Co. v. Molychem L.L.C.*, 414 F. Supp. 2d 1007 (D. Colo. 2005), to support its argument.  *See id.* at 1012 ("*Copperweld* did not address a parent corporation's liability under Section 2 of the Sherman Act.").  This reliance is misplaced for two reasons.  First, *Climax Molybdenum* involved claims for monopolization and attempted monopolization – not conspiracy to monopolize.  *Id.* at 1010.  Second, *Climax Molybdenum*'s discussion of the limits of the *Copperweld* holding came in the context of considering whether an antitrust claim against a parent corporation for acts of its subsidiary is viable.  *Id.* at 1012 ("A Section 2 claim brought against a parent corporation based on anticompetitive activity occurring at the subsidiary level is sufficient if there are factual allegations showing that the subsidiary is the alter ego of the parent of showing independent conduct on the part

of the parent.") (citations omitted).  In other words, the question in *Climax Molybdenum*

was whether a parent and subsidiary could be held directly liable as a single entity, not

whether those entities could, as a matter of law, collaborate to form a multi-party

conspiracy.  *Id.* ("When the parent controls, dictates or encourages the subsidiary's

anticompetitive conduct, the parent engages in sufficient independent conduct to be

held directly liable as a single enterprise with the subsidiary under the Sherman Act.")

(quotation and citation omitted).  *Climax Molybdenum* is simply not relevant to the issue

of whether a parent and subsidiary can conspire to monopolize.

Moreover, although it does not appear that the Tenth Circuit or Supreme Court

have directly considered the issue, numerous cases have extended *Copperweld* to

Section 2 conspiracy claims.  The rationale for this extension was well explained in

*H.R.M., Inc. v. Tele-Communications, Inc.*, 653 F. Supp. 645, 648 (D. Colo. 1987):

> Although section 2 does make illegal purely unilateral conduct, a claim
> under section 2 for conspiracy to monopolize, like a claim under section 1,
> requires at least two participants.  Therefore, the Court's rationale in the
> *Copperweld* decision – that a parent and its wholly-owned subsidiaries
> must be viewed as a single enterprise – also applies to foreclose a claim
> of conspiracy to monopolize under section 2 of the Sherman Act.

*Id.* at 648 (citations omitted).  *See also Surgical Care Center of Hammond, L.C. v.*

*Hosp. Serv. Dist. No. 1 of Tangipahoa Parish*, 309 F.3d 836, 840-41 (5th Cir. 2002)

(conspiracy to monopolize claim barred because "as a matter of law, a corporation and

its agent . . . are incapable of conspiring with one another to violate the antitrust laws");

*Vollrath Co. v. Sammi Corp.,* 9 F.3d 1455, 1463 (9th Cir. 1993) (dismissing, under

*Copperweld*, both section 1 and section 2 conspiracy claims among related

32

corporations); *TV Commc'ns Network, Inc. v. ESPN, Inc.*, 767 F. Supp. 1062, 1074 (D. Colo. 1991) (noting, in context of conspiracy to monopolize claim, that "[a] parent corporation and its subsidiaries cannot conspire with each other for the purposes of antitrust liability"). This is also the view of a leading antitrust treatise. Areeda & Hovenkamp, ¶ 809 n.1 ("[U]nder the *Copperweld* doctrine . . . , subsidiaries of the same parent or firms in a parent/wholly-owned subsidiary relationship cannot conspire to monopolize."). The Court agrees with these pronouncements. Therefore, ARA's allegations of a conspiracy between DaVita and Total Renal Care – under Section 1 or Section 2 – cannot support its claims.

However, ARA contends that the debate over whether a parent and subsidiary can conspire is "academic" because it has alleged that DaVita and Total Renal Care conspired with parties outside of the corporate family in violation of the antitrust laws. In its counterclaims, ARA described the conspiracy to monopolize as follows:

> DaVita and TRC – through their illegal non-compete contracts; exclusivity agreement with NxStage Medical, the sole provider of the only FDA-approved home-care hemodialysis equipment (preventing the sale of such equipment to non-DaVita patients, such as ARA's patients); imposing, and continuing to impose, upon a very large healthcare insurer an exclusive-provider agreement, under which the provider agrees to reimburse only patients who utilize DaVita dialysis centers (to the exclusion of patients who choose to use ARA dialysis centers); and their other actions – conspired to monopolize the kidney-dialysis business in the relevant Denver Market.

(Doc. # 79, ¶ 156.)

Similarly, ARA alleged the following unlawful combination in restraint of trade:

> DaVita and TRC – through their termination of the Western Nephrology
> Physicians' contracts; creation and attempted enforcement of illegal
> non-compete contracts; locking up into long-term, anticompetitive
> contracts its nurses and other employees during what it called a "terrible"
> and "severe" nursing shortage; filing with this Court an objectively
> baseless motion for preliminary injunction, in which the Court would enjoin
> ARA from competing and give DaVita sixty (60) days – competition-free –
> to lockup as many nurses and other employees as possible; entering into
> an exclusivity agreement with NxStage Medical, the sole provider of the
> only FDA-approved home-care hemodialysis equipment (preventing the
> sale of such equipment to non-DaVita patients, such as ARA's patients);
> imposing, and continuing to impose, upon a very large healthcare insurer
> an exclusive-provider agreement, under which the provider agrees to
> reimburse only patients who utilize DaVita dialysis centers (to the
> exclusion of patients who choose to use ARA dialysis centers); without
> disclosing it to their patients, providing patient-retention bonuses to their
> employees for their efforts in ensuring that DaVita's patients do not seek
> healthcare treatment from competitors, including ARA; threatening ARA's
> executives, on several occasions by a senior DaVita executive, that
> DaVita would target ARA in an effort to further enhance their monopolistic
> behavior in the Denver Market and elsewhere; and other actions –
> combined or conspired in substantial restraint of interstate trade or
> commerce.

(*Id.,* ¶ 161.)  ARA asserts that these allegations show a "conspir[acy] **with other

parties**, including the parties to the non-compete agreements, NxStage Medical, and

a very large healthcare insurer."  (Doc. # 93 at 17 (emphasis in original).)

The allegations are not as clear as ARA contends.  The most reasonable

inference from these pleadings seems to be that ARA was not alleging collaboration

among these other groups, but rather was claiming that two actors – DaVita and Total

Renal Care – combined to monopolize the market and restrain trade by, among other

things, forcing non-compete and exclusivity agreements on unwilling participants.

In other words, the pleadings appear to assert that these "other parties" were victims of, not collaborators with, TRC.  Indeed, elsewhere in the pleadings, ARA alleged that TRC "impose[d]" the agreements on NxStage Medical and on the health insurer.  (Doc. # 79, ¶¶ 141, 142.)   However, at the pleading stage, ARA's allegations are to be read in its favor, and it is entitled to the benefit of the doubt.  Moreover, TRC does not take issue with ARA's basic contention that it has asserted collaborative action with these other entities.  (Doc. # 88 at 20 ("ARA vaguely alleged that DaVita/TRC conspired with themselves and with NxStage Medical . . . and an unnamed 'large healthcare insurer' . . . .").  Thus, the Court accepts ARA's claim that it is alleging collective action involving more than just DaVita and Total Renal Care.

TRC does claim that the allegations of conspiracy with the "parties to the non-compete agreements" and "a very large health care insurer" fail because they do not specifically identify who these parties are.  But while an antitrust plaintiff cannot simply allege a conspiracy with "others," *see H.R.M.*, 653 F. Supp. at 648, TRC points to no case holding that an antitrust plaintiff must identify the alleged collaborators by name.  ARA's identification by description is sufficient to give TRC notice of its claims.  These allegations therefore "nudge" ARA's claims of conspiracy between the TRC corporate family and these outside parties "across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570 – although just barely.[4]

---

[4]   The Court is skeptical that TRC could have collaborated with "parties to the non-compete agreements."  These parties are allegedly TRC employees.  (Doc. # 79 ¶ 136.)  The general rule is that "a corporation cannot conspire with its own employees" for the purpose of antitrust liability.  *Motive Parts Warehouse v. Facet Enters.*, 774 F.2d 380, 387 (1985).  There

2.      *Intent to Conspire*

Even accepting that collaboration with these other entities is sufficiently pled,

TRC contends that they do not show the requisite intent necessary for a Section 2

conspiracy to monopolize claim.  (Doc. # 88 at 19-21.)  A conspiracy claim requires

"specific intent to monopolize."  *Monument Builders*, 891 F.2d at 1484.  "If one party's

intent to monopolize is not shared by another party, there can be no conspiracy to

monopolize."  *CDC Techs., Inc. v. IDEXX Labs., Inc.*, 7 F. Supp. 2d 119, 131 (D. Conn.

1998) (citing *Belfiore v. New York Times, Co.*, 826 F.2d 177, 183 (2d Cir. 1987)); *see*

*also Int'l Distribution Ctrs., Inc. v. Walsh Trucking Co., Inc.*, 812 F.2d 786, 796 (2d Cir.

1987) (conspiracy claim requires "a plurality of actors sharing . . . an intent [to create a

monopoly]"); *SuperTurf, Inc. v. Monsanto Co.*, 660 F.2d 1275, 1283 (8th Cir. 1981)

("[I]t must be shown that the defendant's alleged coconspirators . . . shared its specific

intent to create a monopoly . . . .").

ARA's only allegations of intent to monopolize relate to the intentions of the

DaVita/Total Renal Care corporate family – a single actor for antitrust purposes.  (Doc.

# 79, ¶ 152 ("DaVita and TRC had a specific intent to monopolize and preserve and

maintain their monopoly and monopoly power over kidney dialysis clinics and services

in the relevant Denver Market."); ¶ 157 ("DaVita and TRC had a specific intent to

_____

are, however, exceptions to the rule.  *See id.* ("One exception to that general rule . . . is
that employees are capable of combining with their corporate employer where they have an
'independent personal stake' and thus stand to benefit from conspiring with the corporation
to restrain trade." (quoting *Holter v. Moore & Co.*, 702 F.2d 854, 855 (10th Cir. 1983))).  As the
parties do not raise this argument or discuss whether an exception to the rule applies, the Court
does not address this issue here.

36

conspire with themselves and others to monopolize kidney-dialysis clinics and services in the relevant Denver Market.").)  There are no claims that the other collaborating entities shared this intent.  Indeed, as noted above, the allegations seem to indicate that these entities were forced into agreements with TRC.  Thus, even viewing the allegations and drawing the inferences in ARA's favor, ARA's pleadings do not indicate that any of the collaborating entities shared TRC's specific intent to monopolize the market.

For this reason, ARA's conspiracy to monopolize claim fails.  However, as with ARA's failure to define the market, the Court consider this a pleading deficiency, as it may be that ARA could fairly allege some shared intent.  Thus, should ARA choose to re-file its counterclaims, it may attempt to properly plead this conspiracy claim.

## CONCLUSION

To plausibly assert a claim, a plaintiff must plead facts sufficient to give the opposition fair notice of the grounds on which that claim rests.  Although ARA has met this standard in some respects, sufficiently pleading injury, market entry barriers, a pattern of "sham" litigation, and a collaboration with outside entities, its pleadings fall short in several critical areas.  Its failure to properly plead the relevant market compels the dismissal of its first (monopolization), second (attempted monopolization), and fourth (unreasonable restraint of trade) counterclaims.  And its failure to assert any specific intent to monopolize shared by its alleged co-conspirators similarly requires dismissal of its remaining counterclaim (conspiracy to monopolize).  However, for the reasons stated

above, the dismissal of these claims will be without prejudice to refiling with adequate and proper allegations.

If ARA chooses to re-file, however, it may not use its allegations of predatory hiring to support its antitrust claims.  Moreover, given the Court's concerns with ARA's allegations concerning conspiracy with the non-TRC entities, ARA would be well served to refine those allegations as well.

Accordingly, it is

ORDERED that Counterclaim-Defendants' Motion to Dismiss the Counterclaims of American Renal Associates, LLC (Doc. # 88) is GRANTED.  ARA's antitrust counterclaims are DISMISSED WITHOUT PREJUDICE.

DATED:  August __21__, 2009

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge